# HUGHES TOOL CO. ET AL. v. TRANS WORLD AIRLINES, INC.

No. 71–827.   Argued October 10, 1972—Decided January 10, 1973*

---

*Together with No. 71–830, *Trans World Airlines, Inc.* v. *Hughes Tool Co. et al.,* on certiorari to the same court.

Douglas, J., delivered the opinion of the Court, in which Bren-
nan, Stewart, White, Powell, and Rehnquist, JJ., joined.
Burger, C. J., filed a dissenting opinion, in which Blackmun, J.,
joined, *post,* p. 389. Marshall, J., took no part in the considera-
tion or decision of the cases.

*Charles Alan Wright* argued the cause for petitioners
in No. 71–827 and respondents in No. 71–830. With him
on the briefs were *Clark M. Clifford, Thomas D. Finney,
Jr., E. Barrett Prettyman, Jr., Chester C. Davis,* and
*Maxwell E. Cox.*

*Dudley B. Tenney* argued the cause for respondent in
No. 71–827 and petitioner in No. 71–830. With him on
the briefs were *James Wm. Moore, Paul W. Williams,
Marshall H. Cox., Jr., Raymond L. Falls, Jr.,* and *Wil-
liam T. Lifland.*

*Solicitor General Griswold, Assistant Attorney Gen-
eral Kauper, George Edelstein, O. D. Ozment, Warren L.
Sharfman,* and *Robert L. Toomey* filed a memorandum
for the Civil Aeronautics Board as *amicus curiae.*

Mr. Justice Douglas delivered the opinion of the
Court.

The complaint in this litigation alleged antitrust viola-
tions and damages suffered by Trans World Airlines
(TWA) while under control of Hughes Tool Co. (Toolco).

A default judgment was entered for over $145 million with interest at the rate of 7½%. The District Court's opinions confirming the damages award are reported at 308 F. Supp. 679, 312 F. Supp. 478. The Court of Appeals affirmed, 449 F. 2d 51. The cases are here on a petition for certiorari[1] and on a cross petition. 405 U. S. 915.

---

[1] The District Court's judgment on entry of a default and certifying a controlling question of law is reported at 32 F. R. D. 604. The Court of Appeals affirmed, 332 F. 2d 602. We granted certiorari, 379 U. S. 912, but after argument dismissed the writ as improvidently granted. 380 U. S. 248. Moreover, our dismissal as improvidently granted was in 1965 and involved the 1964 judgment of the Court of Appeals. In 1971 a different panel of the Court of Appeals ruled that its 1964 decision was not binding. It noted that prior to its 1971 decision there had been no "final judgment" with respect to the merits of TWA's cause of action against Toolco and therefore *res judicata* did not apply. 449 F. 2d 51, 58. It went on to say that collateral estoppel likewise did not apply, since the only relevant issue that was actually litigated and determined in the 1964 appeal was that the District Court "properly entered the default on Toolco's counterclaims." *Ibid.* That issue, it said, was "a sharply distinguishable issue from the propriety of a different default judgment in favor of Toolco's adversary." *Ibid.*

No party has suggested that our prior dismissal forecloses us from reaching the issue now presented.

The prior dismissal did not establish the law of the case or amount to *res judicata* on the points raised. *Indianapolis* v. *Chase National Bank,* 314 U. S. 63 (1941), was a diversity action in which the District Court, after realigning the parties, dismissed the action for want of jurisdiction. The Court of Appeals reversed and this Court denied certiorari. Two years later, after the Court of Appeals sustained plaintiff's claims on the merits, certiorari was granted and this Court reversed, holding that proper realignment "precludes assumption of jurisdiction based upon diversity of citizenship." 314 U. S., at 74. Similarly, in *Mercer* v. *Theriot,* 377 U. S. 152 (1964), a diversity action for wrongful death, certiorari was initially denied after the Court of Appeals had set aside a jury verdict on the grounds of various trial errors and insufficiency of the evidence. On remand, the District Court denied a motion for a new trial and the

366

The crux of TWA's complaint was the use by Toolco of its control over TWA to control and dictate the manner and method by which TWA acquired aircraft and the necessary financing thereof.[2]

Whether or not that complaint states a cause of action under the antitrust laws is a question we do not reach. Another defense of Toolco was that those transactions were under the control and surveillance of the Civil Aeronautics Board and by virtue of the Federal Aviation Act of 1958 those transactions have immunity from the antitrust laws.

It is our view that the Court of Appeals erroneously rejected that defense. This result, we think, is required by §§ 408 and 414 of the Federal Aviation Act and by our prior decision in *Pan American World Airways* v. *United States*, 371 U. S. 296 (1963).

Section 408 of the Act makes illegal certain mergers, consolidations, and other transactions without the approval of the Civil Aeronautics Board.[3]  Specifically,

---

Court of Appeals affirmed.  We then granted certiorari and reversed because the trial errors did not affect substantial rights and the evidence at the trial was sufficient to sustain a verdict in petitioner's favor.  See also *Hanover Shoe* v. *United Shoe Machinery Corp.*, 392 U. S. 481, 488 n. 6 (1968).

For the well-settled view that denial of certiorari imparts no implication or inference concerning the Court's view of the merits, see *Maryland* v. *Baltimore Radio Show*, 338 U. S. 912, 919 (Frankfurter, J.).

[2] See 449 F. 2d, at 71.

[3] Section 408, 72 Stat. 767, as amended, 49 U. S. C. § 1378, reads in pertinent part as follows:

"(a) Prohibited acts.

"It shall be unlawful unless approved by order of the Board as provided in this section—

  .       .       .       .       .

"(2) For any air carrier, any person controlling an air carrier, any other common carrier, or any person engaged in any other phase

§ 408 (a)(5) requires the approval of the Board when "any person engaged in any other phase of aeronautics" seeks to acquire control of any air carrier in any manner whatsoever. Section 408 (b) authorizes and directs the Board to approve such transactions, including ac-

---

of aeronautics, to purchase, lease, or contract to operate the properties, or any substantial part thereof, of any air carrier;

. . . . .

"(5) For any air carrier or person controlling an air carrier, any other common carrier, any person engaged in any other phase of aeronautics, or any other person to acquire control of any air carrier in any manner whatsoever: *Provided,* That the Board may by order exempt any such acquisition of a noncertificated air carrier from this requirement to the extent and for such periods as may be in the public interest;

. . . . .

"(b) Application to Board; hearing; approval; disposal without hearing.

"Any person seeking approval of a consolidation, merger, purchase, lease, operating contract, or acquisition of control, specified in subsection (a) of this section, shall present an application to the Board, and thereupon the Board shall notify the persons involved in the consolidation, merger, purchase, lease, operating contract, or acquisition of control, and other persons known to have a substantial interest in the proceeding, of the time and place of a public hearing. Unless, after such hearing, the Board finds that the consolidation, merger, purchase, lease, operating contract, or acquisition of control will not be consistent with the public interest or that the conditions of this section will not be fulfilled, it shall by order approve such consolidation, merger, purchase, lease, operating contract, or acquisition of control, upon such terms and conditions as it shall find to be just and reasonable and with such modifications as it may prescribe: *Provided,* That the Board shall not approve any consolidation, merger, purchase, lease, operating contract, or acquisition of control which would result in creating a monopoly or monopolies and thereby restrain competition or jeopardize another air carrier not a party to the consolidation, merger, purchase, lease, operating contract, or acquisition of control . . . ."

In 1969, § 408 (a)(5) was amended to include "any other person" acquiring control of an air carrier.

quisitions of control, that are in the "public interest" and prohibits approval of any transaction "which would result in creating a monopoly or monopolies and thereby restrain competition or jeopardize another air carrier" not a party to the transaction. Section 102 of the Act requires that in assessing the public interest and the public convenience and necessity, the Board should consider, among other things, "[c]ompetition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States . . . ." [4] Section 408 (e) empowers the Board, upon complaint or its own initiative, to investigate and determine whether any person is violating any provision of subsection (a)

---

[4] Section 102, 49 U. S. C. § 1302, reads:

"In the exercise and performance of its powers and duties under this chapter, the Board shall consider the following, among other things, as being in the public interest, and in accordance with the public convenience and necessity:

"(a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

"(b) The regulation of air transportation in such manner as to recognize and preserve the inherent advantages of, assure the highest degree of safety in, and foster sound economic conditions in, such transportation, and to improve the relations between, and coordinate transportation by, air carriers;

"(c) The promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices;

"(d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

"(e) The promotion of safety in air commerce; and

"(f) The promotion, encouragement, and development of civil aeronautics."

and, if such violation is found, to "require such person to take such action, consistent with the provisions of this chapter, as may be necessary, in the opinion of the Board, to prevent further violation of such provision." Under § 408 (d), the Board has broad control over the accounts, records, and reports of anyone controlling an air carrier, and their inspection. The Board is further granted power to control the designation of any officer or director of an air carrier who is an officer, director, member, or the controlling stockholder of any person who is engaged "in any phase of aeronautics." § 409 (a), 49 U. S. C. § 1379 (a). Section 414 relieves from the operation of the antitrust laws any person affected by any order under § 408 "insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order." [5]

It was against this statutory backdrop that the Civil Aeronautics Board issued a series of decisions and orders with respect to the control of TWA by Toolco, the major decisions being issued in 1944, 1948, 1950, and 1960. The first decision, 6 C. A. B. 153 (1944), authorized control of approximately 45.6% of the outstanding stock of TWA. From the Board's opinion issued at that time, it appears that Howard Hughes first became interested in TWA at the invitation of his friend, Jack Frye, the president of TWA. Hughes began acquiring TWA stock through Toolco, which he solely owned. By 1942,

---

[5] Section 414, 49 U. S. C. § 1384, reads:

"Any person affected by any order made under sections 1378, 1379, or 1382 of this title shall be, and is hereby, relieved from the operations of the 'antitrust laws,' as designated in section 12 of Title 15, and of all other restraints or prohibitions made by, or imposed under, authority of law, insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order."

See also §§ 1002 (b), (c), of the Act, 49 U. S. C. §§ 1482 (b), (c).

Toolco had acquired 42.1% of TWA's outstanding stock and for all practical purposes was in position to control the day-to-day affairs of the carrier. Meanwhile, Hughes and Frye had jointly designed a four-engine transport, later known as the Constellation, which Lockheed agreed to manufacture under contract with Toolco. The contract was assigned by Toolco to TWA in 1942, Toolco reserving the right to purchase a sizable number of such aircraft through TWA. It was this arrangement by which Toolco might actually acquire for resale a number of commercial aircraft that, together with its experimental work in aviation and its manufacture of aircraft parts for the military, characterized Toolco as an organization engaged in any phase of aeronautics and therefore forbidden to acquire control of an air carrier such as TWA without the consent of the Board. Toolco's control of TWA, by virtue of its stock ownership which had by 1944 increased to 45.6%, was approved by the Board as being in the public interest and consistent with the provisions of § 408, including the prohibition against monopoly. In order to insure that Toolco would not abuse its power over TWA, "to its own profit and to the detriment of the public interest," 6 C. A. B., at 156, the approval was to continue only so long as intercompany purchases did not exceed $200 per item and did not amount to more than $10,000 in any one calendar year. Annual reports were required in this respect.[6]   6 C. A. B., at 158.

---

[6] The Board's public counsel had opposed such a condition on approval as "imposing far too great a burden upon the Board to ask it to pass upon the wisdom and propriety, in both a technical and business way, of every bargain made by a carrier for the purchase of equipment from a particular manufacturer." Brief for Examiner 25 (filed Apr. 22, 1944). Public counsel's alternative proposed condition required Toolco to forfeit control in the event Toolco should manufacture or sell certain commercial aircraft or Hughes "should attempt to influence TWA with regard to the purchase, ac-

The 1948 and 1950 decisions of the Board originated in a letter agreement presented by Toolco to TWA on January 8, 1947, and accepted by TWA the following day. By this agreement, Toolco agreed to loan $10 million to TWA in return for the latter's interest-bearing notes which were convertible into common stock of the company. On its own initiative, the Board opened an investigation into the matter. At the threshold was the question of Board jurisdiction, which was hotly contested. The Board's June 1948 opinion sustained its jurisdiction, 9 C. A. B. 381. The opinion took a dual approach to the jurisdictional question. It first inquired whether "any change in the activities of Toolco in the field of aeronautics since October 17, 1944, has affected or altered the character of the control approved in Docket No. 1182. It is clear that a substantial change in the activities of Toolco in the field of aeronautics would result in a transaction subject to the Board's jurisdiction under section 408 by reason of the fact that the character and propriety of control originally approved might be altered or changed as a result thereof." 9 C. A. B., at 382.

After reviewing the aeronautical activities of Toolco, it was concluded that the aircraft division of the com-

ceptance, or use by it of any aircraft or aircraft parts in the development or design of which he himself may have participated to a substantial degree." 6 C. A. B., at 157. The Board rejected this proposal, reasoning as follows:

"The conditions proposed by public counsel are complicated and seem to be somewhat indefinite and difficult of enforcement. The object of any condition . . . should be to protect the public interest from any improper coercion of the air carrier by a controlling company on account of any interest which that controlling company may have in some other phase of aeronautics. This can be accomplished by a reasonable limit upon commercial transactions between the acquirer and the acquired which may be had without further consideration in this proceeding by the Board." *Ibid.*

pany was chiefly a large-scale experimental plant for the military and had not substantially changed its status with respect to its participation in any phase of aeronautics.

The Board's second approach to the jurisdictional question was to inquire whether the letter agreement, which would permit Toolco to increase its shareholdings up to 80% of the outstanding shares of TWA, represented such a change in extent or effectiveness of control as to give the Board jurisdiction and require its consent. Its conclusion was that, although Toolco's 45.6% was obviously enough to dominate the Board and control the day-to-day affairs of the company, the 1947 letter agreement would permit Toolco to translate its *de facto* control into full legal control of the company, which would "obviously impl[y] power to dictate the complete corporate activities of the corporation." 9 C. A. B., at 387. This was sufficient to require an order of the Board in addition to the 1944 order.

With its jurisdiction established, the Board proceeded with hearings and inquiry into whether the additional control was consistent with the public interest. This matter was also contested. Toolco thought that only a narrowly focused inquiry was appropriate, but the Board's public counsel not only insisted that the hearings be far-ranging but urged, as a possible solution, that the additional control be disapproved and that the original 1944 proceedings, Docket No. 1182, be reopened to determine whether all control of TWA by Toolco should be terminated. The Board [7] opted for an investigation

---

[7] References to the Board's 1950 opinion are actually to the opinion of the Trial Examiner. But the Board adopted as its own "the findings, conclusions, and recommended decision of the examiner" without modification. 12 C. A. B. 192, 193.

sufficiently broad to inquire "into the actions and policies of the controlling company with respect to TWA for the period during which the prior-approved control existed . . . [f]or inevitably the controlling company, by virtue of its investment in the acquired carrier, will endeavor to make itself accountable—as indeed the acquirer here under scrutiny had—for the managerial efficiency, the operating economy, and the financial integrity of the controlled carrier." 12 C. A. B. 192, 196 (1950). Before approving the additional acquisition, which would make certain "[c]omplete actual and legal control," id., at 197, the Board determined not only to examine the future plans of Toolco but also its past conduct with respect to TWA.

Accordingly, the Toolco-Hughes-TWA relationship from 1939 to the date of the decision was examined in detail, including the events occurring since the letter agreement of January 1947. The major focus of the inquiry was the differences between TWA management and Toolco with respect to the acquisition of new flight equipment—the quantity, the type, the timing, and the financing thereof. Unquestionably, TWA had been and was in need of additional financing to make possible the purchase of new equipment, particularly that needed to operate its expanded routes. TWA proposed and preferred equity financing in large measure, but Toolco most often insisted on financing new equipment through credit arrangements. Disagreement caused delay, and this, in combination with other factors, brought TWA to the verge of bankruptcy or reorganization in late 1946. It was at this juncture that the January 1947 letter agreement eventuated. Financial failure was averted; but urgent needs for new equipment continued, and substantial additions were made in the years from 1947 to 1950, most of it with the aid of Toolco and some of it

by purchase from Toolco itself.[8]  By the time the hearings concluded and the case was under submission, TWA's financial condition had considerably improved, measurably aided by better operating results, better expense control, and a stock offering to stockholders with the unsubscribed amount being underwritten by investment bankers.  12 C. A. B., at 208–209.

In considering whether the additional control by Toolco would be in the public interest, the Board observed that there was no conflict of interest between Toolco's present or contemplated aeronautical activities and its control of an air carrier and that enhanced control presented no problems under the antimonopoly provisions of § 408 (b).  *Id.*, at 216.  The Board then noted that Toolco's contributions to the science of aeronautics by way of aircraft design and instrumental aids to aviation for both the armed services and civil aviation have been substantial and found that "of specific importance to TWA, have been the contributions of Toolco and Mr. Hughes in the way of financial support to the carrier, in the selection and purchase of its equipment, and their advice and guidance to the engineering and operations departments of the carrier." *Ibid.*[9]  Most important,

---

[8] The Examiner found that it was "necessary" for Toolco to acquire aircraft initially and then resell them to TWA on a conditional sales basis because TWA "could not have purchased [the aircraft] directly without the specific consent of its principal creditors."  12 C. A. B., at 218.

[9] For example, the Examiner found that:

"Even before TWA's financial crisis of late 1946, the financial resources of Toolco were used to provide credit for the carrier.  For example, the credit arrangements provided by Toolco made possible the placing of the original order for the Constellation airplane with the Lockheed Aircraft Corporation.  There is little doubt that the Constellation would not have been developed as early as it had without the aid of Mr. Hughes and his company.  In addition to the technical assistance from Mr. Hughes and his engineers in

however, in the Board's opinion, were the efforts of Toolco to improve the financial position of TWA during the last few years. Although criticizing Toolco, along with others in the aircraft transportation industry, for relying too heavily on debt financing which, in the case of TWA had resulted in a very difficult, lopsided capital structure, the Board concluded that the record would not support a finding that the additional control would be inconsistent with the public interest. Indeed, the Board concluded that "[t]he continued interest of Toolco in TWA appears essential to the best interests of the carrier and the public." *Id.*, at 224.

The Board's approval in 1950 of the complete control of TWA by Toolco was made "subject to the terms and conditions" imposed by the 1944 order with respect to intercompany purchases and annual reporting. See *supra*, at 370. As a result, from 1944 through 1960, every acquisition or lease of aircraft by TWA from Toolco and each financing of TWA by Toolco required Board approval. Applications by Toolco were made to the Board in each instance, with the terms and conditions of the transactions being described.[10] Each was approved by

---

Toolco, the financial commitment which was necessary to undertake and continue the project could never have been made and met by TWA." 12 C. A. B., at 216.

[10] For example: On May 15, 1959, the Board authorized Toolco to lease 11 Boeing jets and 30 spare jet engines to TWA. The Board required that a separate lease be executed for each aircraft and modified the previous order under § 408 to permit aircraft lease transactions between TWA and Toolco and to authorize an agreement covering $3½ million worth of spare parts.

On July 1, 1959, Toolco asked that 10 leases of Boeing aircraft to TWA be modified so as to permit the extension of the 10 leases under the same rental until no later than September 30, 1959, and to permit the lease under identical terms of four additional Boeing jets and to permit the purchase from Toolco at actual cost of additional spare parts necessary for the operation of the leased jet

the Board and each was regarded as a modification or interpretation of its antecedent control orders under § 408. Each of these transactional orders recited a finding of the Board that the transaction was "just and reasonable and in the public interest." Then, in December 1960, the Board issued an order approving a major proposal by TWA for the acquisition of jet equipment, which among other things involved fundamental changes in relationship between TWA and Toolco in that the stock of the former, at the insistence of the financial institutions involved in the program, was to be placed in a voting trust and the company's Board of Directors reconstituted. 32 C. A. B. 1363. The dominant position of Toolco thus ended for the period of the trusteeship. In the course of its opinion accompanying the order, the Board stated that although it had not been officially informed of the reasons for the banks' insistence on the voting trust, it was not "unaware of TWA's problems." *Id.*, at 1364. The Board knew, because it was a matter of public record, that TWA had been delayed in financing its jet fleet and the Board's opinion was that TWA had probably suffered because more attractive financing terms were no longer available and because the

---

airliners. This order of the Board also constituted a modification of the original order of control granted under § 408.

On September 30, 1959, Toolco asked permission to extend the leases of 10 Boeing jets. The extension was to be under the identical terms of the original leases, the new leases to be terminated by either party within 24 hours on written notice. Here again the Board modified the original transaction under § 408.

On January 29, 1959, Toolco asked permission to lease to TWA on a day-to-day basis up to eight Boeing aircraft and up to eight Convairs, and for TWA to purchase from Toolco at actual cost such spare parts as were necessary and such other equipment as might be required. Here again the Board entered an order that qualified its original "control" order under § 408.

unavailability of equipment may have contributed to the company's failure to maintain its normal share of the transportation market. "Under these circumstances" the Board said, "we think it clear that Board action to facilitate TWA's acquisition of jet equipment is in the public interest. At the same time, however, it is evident that Toolco's control of TWA, as exercised through Hughes, has presented substantial problems requiring the Board's attention." *Id.*, at 1365. The Board went on to make clear that its approval would be required before Toolco would be permitted to reassume control over TWA and that any such approval would be forthcoming only after a most "searching inquiry" into the public interest factors involved.[11] *Ibid.*

It was six months later that TWA, now no longer under control of Toolco, filed suit against the latter alleging violations of the antitrust laws to the injury of TWA's business. As analyzed by the Court of Appeals in its opinions filed in this case, the complaint rested principally on Toolco's conduct as controlling stockholder during the years 1955–1960. The assertions were

---

[11] In a footnote, the Board amplified what it meant by public-interest factors through reference to the following excerpt from its 1950 decision (12 C. A. B., at 196):

"Aside from any undesirable influence on an air carrier which might arise because of the acquirer's interest in a given phase of aeronautics, an acquirer of an air carrier is not without responsibility in other respects for an air carrier's general capacity to perform its public responsibilities. For inevitably the controlling company, by virtue of its investment in the acquired carrier, will endeavor to make itself accountable . . . for the managerial efficiency, the operating economy, and the financial integrity of the controlled carrier. Accordingly, in determining whether or not a particular acquisition should be approved, it is necessary to consider the over-all impact of the acquirer's plans and policies with respect to the controlled carrier."

that in 1955 the commercial air industry was converting to jet aircraft, and that TWA's competitors began in that year "to aid in the development of and to purchase jet planes." 332 F. 2d 602, 605. Toolco and General Dynamics Corp. (Convair) had entered into an arrangement for the joint development of a suitable aircraft but the plan proved abortive, whereupon Toolco considered but ultimately abandoned a plan for itself to enter aircraft production. Meanwhile, Toolco had arranged for the purchase of jet aircraft from Convair and Boeing, the arrangements providing that Toolco could assign its rights to such aircraft to TWA.

As respects its defense that CAB control and surveillance gave it immunity from the antitrust suit, Toolco relies on *Pan American World Airways* v. *United States,* 371 U. S. 296. The Court of Appeals distinguished that case, saying that there the unlawful division of territories and allocation of routes were directly "within the ambit of powers explicitly granted the Board by the Congress," 332 F. 2d, at 608. The Court of Appeals said that the present case was different because, in its view, the continuing supervision of the Board over the Toolco-TWA relationship was general and not related to specific conduct that gave rise to violations of the antitrust laws.

The transactions on the basis of which damages were awarded were based primarily on profits lost as a result of five transactions relating to orders placed by Toolco for a fleet of 63 jet aircraft destined for use by TWA. 449 F. 2d, at 65–66:

(1) The diversion of six Convairs by Toolco to Northeast Airlines;

(2) The temporary retention by Toolco of four other Convairs and their ultimate lease to Northeast Airlines;

(3) The diversion of six Boeing jets out of 33 ordered to Pan American Airways;

(4) The lease, instead of outright sales, of jets in 1959–1960; and

(5) The late delivery of 47 of the 63 jets.

One difficulty with the conclusion of the Court of Appeals that these transactions, unlike those involved in the *Pan American* case, were transactions on which the Board might take action but did not do so, is that it misconstrues the record. As noted, from 1944 through 1960 every acquisition or lease of aircraft by TWA from Toolco and each financing of TWA by Toolco required Board approval. Each transaction was approved by the Board and each approval was an order under § 408, for the Board regarded its transactional orders as modifications or interpretations of its antecedent control order. Each of the modification orders recited a finding of the Board that the transactions were "just and reasonable and in the public interest."

It is said, however, that while the Board modified its original "control" order under § 408 so as to permit sale or lease of the aircraft out of which the alleged antitrust violations occurred, the approval of the Board did not sanction the precise way in which Toolco allegedly used the power to the disadvantage of TWA. But that is not an answer to the problem of exemption.

The Federal Aviation Act as construed and applied by this Court and the Civil Aeronautics Board dictates a contrary result.

In *Pan American World Airways* v. *United States, supra,* the United States brought a civil antitrust action under §§ 1, 2, and 3 of the Sherman Act challenging the joint control of Panagra, an air carrier, by Pan American Airways and W. R. Grace & Co. The allegations were that Pan American, Grace, and Panagra had divided territories, that Pan American and Grace had conspired to monopolize air transportation on the west coast of South America, and that Pan American had used

its power to prevent Panagra from extending its routes from the Canal Zone to the United States. The District Court found no division of territories and no conspiracy between Grace and Pan American but concluded that Pan American had violated the Sherman Act in interfering with Panagra's possible route extension. On cross appeals by Pan American and the United States, this Court held that the complaint should have been dismissed because § 411 of the Act gave the CAB broad power to investigate and bring to a halt unfair practices and unfair methods of competition, including those alleged in the complaint, and because if the courts were to intrude independently with their own construction of the antitrust laws the two regimes might collide. Hence, relief against the alleged division of territories, allocation of routes, and conspiracy to monopolize was a matter exclusively for the Board. The Court also pointed out that under § 414 of the Act, Board orders carried antitrust immunity for any conduct authorized, approved, or required by the order and that it would be odd to hold that an affiliation between an air carrier and others that would pass muster under § 408 could nevertheless run afoul of the antitrust laws: "Whether or not transactions of that character meet the standards of competition and monopoly provided by the Act is peculiarly a question for the Board, subject of course to judicial review as provided in 49 U. S. C. § 1486." 371 U. S., at 309.

As previously indicated, the Court of Appeals did not consider *Pan American* to be relevant or controlling because, different from the situation there, the conduct challenged in TWA's complaint against Toolco was "unrelated to any specific function of the CAB" and hence was not within the exclusive competence of that body. 332 F. 2d, at 608. This view is difficult to square with the statute and the several opinions and

orders issued by the Board with respect to the relationship between Toolco and TWA.

The Act expressly forbade Toolco to acquire control of TWA without approval of the Board. Section 408, however, directed the Board to approve the acquisition if consistent with the public interest and empowered it to remedy any acquisition of control by Toolco obtained otherwise than in accordance with the Act. It is also perfectly clear that in 1944 the Board approved the acquisition of control of TWA by Toolco by virtue of a 45.6% stock ownership and that in 1948 and 1950 the Board approved a transaction that could have increased Toolco's holdings to 80% and transformed its *de facto* control into full legal, as well as practical, control.

In reaching this conclusion, the Board inquired broadly into all phases of the exercise of Toolco's control over TWA during the years 1944–1947. It was not only proper but necessary in determining whether further acquisition of control was consistent with the public interest to examine "into the actions and policies of the controlling company . . . [f]or inevitably the controlling company, by virtue of its investment in the acquired carrier, will endeavor to make itself accountable . . . for the managerial efficiency, the operating economy, and the financial integrity of the controlled carrier." 12 C. A. B., at 196. Hence, of major interest to the Board were the decisions of Toolco with respect to the type, quantity, timing, and financing of new equipment acquisitions by TWA. It examined and dealt with in great detail the assertions that Toolco had improperly delayed the arrival of new equipment, had insisted on debt rather than equity financing, and itself had sold or leased aircraft to TWA. All of these matters, the Board concluded, were central to proper determination of the issue of the additional con-

trol and, indeed, to the additional question before the Board as to whether the existing relationship should have been completely terminated.

The point is that the conduct of Toolco with which the Board so extensively dealt in 1950 is the same kind of conduct charged to Toolco in the 1950's and alleged by TWA in its complaint to violate the antitrust laws. It is, therefore, difficult to understand how the Court of Appeals could conclude that the acts of Toolco in controlling, allegedly to the injury of TWA, the timing, the financing, and the flow of new equipment to TWA were unrelated to any function of the Board under the Act. Clearly, such considerations were in the mainstream of the Board's § 408 responsibilities to insure that only those acquisitions of control that are in the public interest are approved.

Nor is it tenable to argue that, however relevant Toolco's new equipment decisions might have been to the public-interest standard mandated for Board approval of the additional control obtained in 1947, the Board's authority nevertheless terminated with that approval and that the Board, having issued its approval, was powerless to control or oversee its exercise in the years to come. Section 408 permits only those acquisitions of control that are not inconsistent with the public interest and that will not result in a monopoly. It also authorizes the Board to approve acquisitions subject to such conditions as it may deem desirable. Section 408 (e) empowers the Board to investigate and remedy violations of § 408 (a). If a carrier has acquired control "in any manner whatsoever" other than that approved by the Board, the Board is authorized either on complaint or its own initiative to investigate and if a violation is discovered it is ordered to remedy that situation. Section 204 (a), 49 U. S. C. § 1324 (a), authorizes the Board to issue and amend such orders as it shall deem necessary

to carry out the provisions of and to exercise and perform its powers and duties under the statute.[12]

It seems sufficiently apparent, therefore, that the Board did not exhaust its powers with respect to Toolco's control of TWA when it issued its order of approval in Docket No. 1182 in 1944. Obviously, the Board remained competent to enforce or to waive the conditions attached to that order. It did so many times. See n. 10, *supra*. It also is clear from the 1948 and 1950 proceedings, where the Board's jurisdiction was challenged, that its jurisdiction was triggered not only by substantial additional acquisitions of stock but by any change in the extent or effectiveness of Toolco's control or in Toolco's position in the aeronautics industry. The Board also implied that had Toolco's exercise of control over TWA from 1942 to 1947 been sufficiently unacceptable to foreclose the additional acquisition of control, reopening of Docket No. 1182 and re-examination of the initial approval would have been justified.

We have little doubt that the authority of the Board, either on complaint or its own initiative, extended to forbidding any exercise of control by Toolco which was not authorized or contemplated by the initial or subsequent approval. This seems the clear import of the Act and of the Board's 1948–1950 proceedings.

Also instructive is the Board's response when asked in 1956 to modify its original order so as to permit TWA's purchase of up to 25 jet-powered aircraft from Toolco.

---

[12] See also § 415 of the Act, 49 U. S. C. § 1385, which provides that:

"For the purpose of exercising and performing its powers and duties under this chapter, the Board is empowered to inquire into the management of the business of any air carrier and, to the extent reasonably necessary for any such inquiry, to obtain from such carrier, and *from any person controlling . . . such air carrier,* full and complete reports and other information." (Emphasis added.)

Reciting that its prior approvals of Toolco's control of TWA had been premised upon the assumption that Toolco was not engaged in the manufacture or sale of aircraft for commercial use, the Board forthwith opened an investigation to determine whether Toolco's position in the aeronautics industry had so changed as to result in a transaction subject to the Board's jurisdiction under § 408. The motion for waiver of the 1944 condition was consolidated with this new proceeding. The proceeding was later canceled when the motion to waive the 1944 condition was withdrawn, but clearly the Board thought, and rightly so, that it had continuing power to audit the ongoing relationship between TWA and Toolco.

It is also difficult to read in any other manner the recital by the CAB, in the course of approval of the 1960 voting trust arrangement, of Toolco's alleged conduct in delaying the delivery of new equipment and dictating the financing of same, all to TWA's alleged injury, followed by its assertion that such conduct "presented substantial problems requiring the Board's attention." 32 C. A. B., at 1365.

It is therefore no answer to say that our *Pan American* decision does not cover the alleged antitrust violations involved in the Toolco-TWA transactions for which treble damages were sought. As noted, § 408 (b) states that the Board shall not approve any "acquisition of control" which would result "in creating a monopoly or monopolies and thereby restrain competition or jeopardize another air carrier." Moreover, the Board in granting permission to "control" an air carrier must consider the standards of the public interest as defined in § 102 of the Act. Among such standards is that set forth in § 102 (c), which, as indicated, *ante,* at 368 n. 4, provides:

> "The promotion of adequate, economical, and efficient service by air carriers at reasonable charges,

without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices."

Competition and monopoly [13]—two ingredients of the antitrust laws—are thus standards governing the CAB's exercise of authority in granting, allowing, or expanding or contracting the control which Toolco had over TWA by reason of the various orders issued by the CAB under § 408. In this context, the authority of the Board to grant the power to "control" and to investigate and alter the manner in which that "control" is exercised leads us to conclude that this phase of CAB jurisdiction, like the one in the *Pan American* case, pre-empts the antitrust field.[14] It should be noted in that connection that in

---

[13] The Board in an early decision refused to approve a joint agreement among carriers because of its antitrust aspects:

"Agreements of this nature, whereby a carrier operating in a particular territory obtains from a prospective competitor an undertaking, express or implied, not to attempt competitive operations, are likely to tend to impede the development of competition to the extent required by the present and future needs of the nation. Accordingly, we are of the opinion that such agreements thwart the purposes of the Act, and that their formation should in general be discouraged." *Pan American Airways,* 3 C. A. B. 540, 546–547.

[14] The *Pan American* case is consistent with the view expressed in *Silver* v. *New York Stock Exchange,* 373 U. S. 341, 360–361, that a statutory scheme that does not create a total exception from antitrust laws may, nonetheless, in particular and discrete instances by implication grant immunity from an antitrust claim.

To the same effect is *United States* v. *Borden Co.,* 308 U. S. 188, 200, where the Court said:

"That the field covered by the Agricultural Act is not coterminous with that. covered by the Sherman Act is manifest from the fact that the former is thus delimited by the prescribed action participated in and directed by an officer of government proceeding under the authority specifically conferred by Congress. As to agreements and arrangements not thus agreed upon or directed by the Secretary,

the *Pan American* case, Pan American, which owned 50% of the stock of the air carrier Panagra, was charged with using its control to prevent Panagra from receiving the authority of the CAB to extend its route from the Canal Zone to the United States. That restraint was held beyond the reach of the antitrust laws even though the CAB had taken no action to investigate, let alone act on, the alleged misfeasance as the Board has done here for over 16 years.

We think the Court of Appeals erred also in construing § 414, which immunizes from antitrust liability any conduct approved, authorized, or required ·by any Board order issued under § 408. As we read this record, the Board not only approved Toolco's ownership of TWA stock but it also contemplated actual and legal control of TWA by Toolco. The Board made it as plain as possible that Toolco's stock ownership would inevitably result in Toolco's exercising authority over the day-to-day affairs of TWA, including the acquisition and financing of equipment. It was precisely this kind of control the Board approved. Toolco's power of decision with respect to these matters was central to the public-interest issue. What is more, the Board not only concluded that Toolco's stewardship, although faulty in some respects, had been a great benefit to TWA and to the public in years gone by, but also determined that the additional control sought by Toolco and continuation of TWA-Toolco relationships were essential to the public interest.

It is too clear for argument that in entering the 1950 order the Board fully realized that Toolco had determined and would determine when and how much new equipment would be purchased, from whom it would be

the Agricultural Act in no way impinges upon the prohibitions and penalties of the Sherman Act, and its condemnation of private action in entering into combinations and conspiracies which impose the prohibited restraint upon interstate commerce remains untouched."

acquired, and how it would be financed. It was precisely this type of association that it contemplated when it approved the additional control obtained by Toolco in 1947. And it was precisely this same conclusion that the Board was implementing each time during the 1950's that it approved a sale or a lease of an airplane from Toolco to TWA which, without its approval, would have violated the Board's ongoing limitation on the size of intercompany transactions.

We repeat, however, what we said in the *Pan American* case that the Federal Aviation Act does not completely displace the antitrust laws.

> "While the Board is empowered to deal with numerous aspects of what are normally thought of as antitrust problems, those expressly entrusted to it encompass only a fraction of the total." 371 U. S., at 305.

One of the most conspicuous exceptions would be the combination or agreement between two air carriers involving trade restraints. See *Timken Co.* v. *United States,* 341 U. S. 593, 598.

There may be other exceptions. But where, as here, the CAB authorizes control of an air carrier to be acquired by another person or corporation, and where it specifically authorizes as in the public interest specific transactions between the parent and the subsidiary, the way in which that control is exercised in those precise situations is under the surveillance of the CAB, not in the hands of those who can invoke the sanctions of the antitrust laws. As noted, the parent company which controls an air carrier is subject to pervasive control by the CAB. The control which the CAB is authorized to grant or to deny under § 408 involves an appraisal of the impact of that control in terms of monopoly and competition; and the ongoing supervision entrusted to the CAB by § 415 is broad enough to put all transactions between

parent and subsidiary—as originally conceived or subsequently exercised—under CAB supervision.

We cannot believe that if the day after the Board's order of 1950, a minority stockholder had instituted a derivative antitrust suit against Toolco, alleging that Toolco had monopolized the TWA market from 1944 to 1950, delayed deliveries of aircraft, and insisted on improvident financing arrangements, such a suit could have survived a motion to dismiss based on § 414. Such an action would have sought to negate what the Board, after full investigation, had found consistent with § 408's antimonopoly provision, consistent with § 102's competition standard, and consistent with the public interest.

TWA's suit in 1961 carries no better credentials, for it sought to terminate a relationship the continuation of which the Board had found essential to both TWA and the public interest and to penalize the type of conduct which the Board expressly contemplated and preferred would continue unless and until a different order from the Board was forthcoming.

It adds nothing to the analysis to characterize Toolco's exercise of power over TWA as monopolization of the TWA market, for it was precisely such control that the Board opted for in 1944 and 1950. Moreover, a condition of the order was that Toolco's sales to TWA could not assume more than negligible proportions without in every instance the Board's approving the transaction as being consistent with the public interest. Nor does it add to the argument to describe Toolco's conduct as furthering a tying or exclusive-dealing arrangement or as a conspiracy to restrain trade in that market represented by TWA.

The short of it is that in our view §§ 408 and 414 of the Act, as construed in *Pan American,* require reversal of the Court of Appeals and dismissal of this action. What TWA charged in its complaint was no more than the kind of conduct the CAB in 1950 had approved and

authorized for the future; and, in any event, such conduct was within the power of the Board to control and was central to the mandate of § 408 to permit control of TWA by Toolco only if consistent with the public interest.

We by no means hold that the Federal Aviation Act completely displaces the antitrust laws. *Pan American,* 371 U. S., at 305. But where, as here, the CAB authorizes control of an air carrier to be acquired by another person or corporation, and where the CAB specifically authorizes as in the public interest specific transactions between the parent and the subsidiary, the way in which that control is exercised in those precise situations is under the surveillance of the CAB, not in the hands of those who can invoke the sanctions of the antitrust laws. The control which the CAB is authorized to grant or to deny under § 408 involves an appraisal of the impact of that control in terms of monopoly and competition; and the ongoing supervision entrusted to the CAB by § 415 is broad enough to put all transactions between parent and subsidiary—as originally conceived or subsequently exercised—under CAB supervision.

This conclusion necessitates a dismissal of the cross-petition, a reversal of the judgment below, and a remand with directions to dismiss the complaint, as the numerous other points briefed and argued become irrelevant in that posture of the litigation.

*Reversed.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of these cases.

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE BLACKMUN joins, dissenting.

The history of this cause is so remarkable—indeed unique in the annals of modern federal jurisprudence, so far as I am aware—that I must preface my dissent on the

merits with a recital of the course of this litigation over nearly a dozen years. This protracted litigation, conducted at enormous cost, now comes to an abrupt end on an issue directly presented to this Court nearly eight years ago but not decided. As the strange history will demonstrate, resolution of the issue when it was first before the Court, as now decided, would have terminated this litigation without having the parties invest untold efforts and vast expense in a now wholly irrelevant contest over the proper measure of damages.

On June 30, 1961, TWA filed a complaint against the Hughes Tool Co. in the United States District Court for the Southern District of New York, charging violations of the antitrust laws. On February 7, 1962, the District Court filed a pretrial order, appointing a Special Master to act in discovery and deposition proceedings. After discovery proceeded to an impasse, on February 1, 1963, the District Court ordered Howard Hughes to appear for a deposition and ordered the defendant Toolco to produce certain documents that it had previously refused to produce. Shortly thereafter, on February 7, 1963, the District Court entered a memorandum opinion and order denying a motion to dismiss TWA's complaint.[1] In response to the order to produce Hughes for examination along with the contested documents, Toolco filed a "notice of position," on February 8, 1963, advising the District Court and TWA that it had chosen to rest on the merits of its positions in order to "avoid the burdens and expenses involved in further pretrial and trial proceedings prior to the time that an appellate court has had the opportunity to rule upon the decisions and orders heretofore made herein."

This "notice of position" constituted a default and accordingly judgment was entered against Toolco, on

---

[1] 32 F. R. D. 604.

May 3, 1963. The District Court then certified to the United States Court of Appeals for the Second Circuit the question of the sufficiency of the complaint on which the default judgment was based. The issue of damages was referred to the Special Master. On June 2, 1964, the Second Circuit issued an opinion in which it decided that the District Court had jurisdiction of the action and that the orders of the Civil Aeronautics Board affecting the relationship between the parties did not constitute a good defense to the antitrust claims of TWA.[2] On November 16, 1964, this Court granted certiorari to review the judgment of the Court of Appeals.[3] After full argument and briefing, but without opinion, the writ was dismissed as improvidently granted on March 8, 1965,[4] and the case returned to the District Court for further proceedings to determine the amount of TWA's damages.

For nearly three years, proceedings were held before the Special Master[5] to determine the appropriate amount of damages. On December 23, 1969, the District Court filed a new opinion confirming a report of the Special Master awarding damages amounting to $137,611,435.95.[6] On April 14, 1970, the District Court filed a superseding order in which it added to the TWA award $7,500,000 as a reasonable attorney's fee (representing some 56,000 hours of work at a "mixed rate" of $128 per hour) and $336,705.12 in costs, for a total of $145,448,141.07, plus interest. The judgment was stayed pending a renewed appeal to the Court of Appeals, which,

[2] 332 F. 2d 602.

[3] 379 U. S. 912.

[4] 380 U. S. 248.

[5] Herbert Brownell replaced J. Lee Rankin as Special Master when Rankin resigned in December 1965 to become Corporation Counsel for New York City.

[6] 308 F. Supp. 679.

on September 1, 1971, affirmed the judgment of the District Court, with only slight modification.[7]

This Court again granted certiorari on February 22, 1972,[8] and today—more than 11 years after it all began and more than seven years after the now-determinative issue was brushed aside by this Court—the Court discovers that the actions alleged in TWA's complaint were immunized from the antitrust laws by the Civil Aeronautics Board's role in the Toolco-TWA relationship. This, of course, was the precise issue tendered to this Court for decision in 1964 in order to secure an early decision that might end the contest before enormous additional sums were expended in proving damages resulting from the actions alleged in TWA's complaint.[9]

---

[7] 449 F. 2d 51.

[8] 405 U. S. 915.

[9] Toolco's 1964 petition for certiorari posed three questions, the first being as follows:

"1. Where the Civil Aeronautics Board has approved the acquisition of a controlling stock interest in an air carrier by a person engaged in a phase of aeronautics and has further approved or has jurisdiction to approve all relevant transactions between them under an Act which immunizes the approved transactions from the antitrust laws, does the district court have jurisdiction to entertain a complaint by such air carrier alleging that the transactions between the subsidiary air carrier and its parent violated the antitrust laws in that they constituted a conspiracy, an attempt to monopolize and an acquisition in violation of the antitrust laws?"

Toolco's petition in the present case posed seven questions, the fourth of which was as follows:

"4. When the Civil Aeronautics Board has approved an acquisition of control over an air carrier by a person engaged in a phase of aeronautics and has further approved all relevant transactions between them, is the exercise of that control to determine how the air carrier acquires aircraft and the necessary financing therefor immunized from the operation of the antitrust laws under Section 414 of the Federal Aviation Act?"

This capsule chronicle of the present litigation barely suggests its factual complexity. To describe this litigation as a 20th-century sequel to Bleak House is only a slight exaggeration. Dickens himself could scarcely have imagined that 56,000 hours of lawyering at a cost of $7,500,000 would represent the visible expenses of only one party to a modern intercorporate conflict, to say nothing of the time of corporate and management personnel diverted from their daily tasks.[10] Indeed, today's "ending" is quite a surprise—as great a surprise for some of us as it must be for the parties. I suggest it will even surprise the victors, for in the oral argument to this Court only a few fleeting comments were devoted to the point that now becomes the dispositive issue in the case. Of course, this was a sound allocation by counsel of the limited time allowed for argument since the Court had not considered the point worthy of notice in 1964 when the case was first here.

To be sure, all this is secondary to the correctness of today's decision. I am unable to join the Court's disposition because I believe it departs markedly from our prior decisions uniformly holding that repeal of the antitrust laws to accommodate other federal regulatory statutes "is to be regarded as implied only if necessary to make the [regulatory scheme] work, and even then only to the minimum extent necessary." *Silver* v. *New York Stock Exchange,* 373 U. S. 341, 357 (1963). In particular, the Court today substantially enlarges the scope of *Pan American World Airways* v. *United States,* 371 U. S. 296 (1963), a case which the Court says "requires" the result it reaches today—notwithstanding that

---

[10] It is not unreasonable to assume that the battalions of lawyers for these adversaries devoted substantially the same effort and time, thus bringing counsel fees in the aggregate to the sum of $15 million.

*Pan American's* teaching was available in Volume 371 of the United States Reports when the Court dismissed the writ in this cause as improvidently granted.

I

Passing to the merits of the Court's holding, I find it necessary at the outset to supplement the Court's description of the statutory framework from which this litigation arises. Section 408 of the Federal Aviation Act of 1958, 49 U. S. C. § 1378,[11] requires the approval of the

[11] Section 408, 49 U. S. C. § 1378, reads in pertinent part as follows:
"(a) Prohibited acts.

"It shall be unlawful unless approved by order of the Board as provided in this section—

.     .     .     .     .

"(2) For any air carrier, any person controlling an air carrier, any other common carrier, or any person engaged in any other phase of aeronautics, to purchase, lease, or contract to operate the properties, or any substantial part thereof, of any air carrier;

.     .     .     .     .

"(5) For any air carrier or person controlling an air carrier, any other common carrier, any person engaged in any other phase of aeronautics, or any other person to acquire control of any air carrier in any manner whatsoever: *Provided,* That the Board may by order exempt any such acquisition of a noncertificated air carrier from this requirement to the extent and for such periods as may be in the public interest;

.     .     .     .     .

"(b) Application to Board; hearing; approval; disposal without hearing.

"Any person seeking approval of a consolidation, merger, purchase, lease, operating contract, or acquisition of control, specified in subsection (a) of this section, shall present an application to the Board, and thereupon the Board shall notify the persons involved in the consolidation, merger, purchase, lease, operating contract, or acquisition of control, and other persons known to have a substantial interest in the proceeding, of the time and place of a public hearing. Unless, after such hearing, the Board finds that the consolidation,

CAB when any person [12] seeks to acquire a controlling interest in any air carrier. The Board may approve such acquisition only if it finds that the acquisition will be consistent with the public interest. § 408 (b), 49 U. S. C. § 1378 (b). Specifically, the Board "shall not approve any . . . acquisition of control which would result in creating a monopoly or monopolies and thereby restrain competition or jeopardize another air carrier not a party to the . . . acquisition of control." *Ibid.*

The Act fails to elaborate on the scope of its command to the CAB not to approve any acquisition that would create a monopoly and thereby restrain competition. In other words, the Act fails to specify the relevant market or markets to which the Board must look in determining whether a particular acquisition or exercise of control is forbidden. Section 102 of the Act,[13]

---

merger, purchase, lease, operating contract, or acquisition of control will not be consistent with the public interest or that the conditions of this section will not be fulfilled, it shall by order approve such consolidation, merger, purchase, lease, operating contract, or acquisition of control, upon such terms and conditions as it shall find to be just and reasonable and with such modifications as it may prescribe: *Provided,* That the Board shall not approve any consolidation, merger, purchase, lease, operating contract, or acquisition of control which would result in creating a monopoly or monopolies and thereby restrain competition or jeopardize another air carrier not a party to the consolidation, merger, purchase, lease, operating contract, or acquisition of control . . . ."

[12] Section 408 (a)(5) was amended in 1969 to require Board approval of an acquisition of control of an air carrier by "any other person." 83 Stat. 103, 49 U. S. C. § 1378 (a)(5). Prior to 1969, the Act required Board approval only for acquisition of control of an air carrier by another air carrier, by persons having other specified transportation interests, or by a "person engaged in any other phase of aeronautics."

[13] Section 102, 49 U. S. C. § 1302, reads:

"In the exercise and performance of its powers and duties under this chapter, the Board shall consider the following, among other

enumerating the general policies that are to guide the Board, is similarly ambiguous. It includes among those factors to be weighed in evaluating the "public interest" factor under the Act "[c]ompetition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the . . . commerce of the United States . . . ." Again, though, the question is: competition by whom? In which market or markets?

There can be no doubt the Board is responsible for promoting competition in some sense; our inquiry is whether the Board is charged with fostering competition both within the air transportation market and without, in other markets essentially unrelated to air transportation and alien to the purposes for which the Board was created. Resolution of this ambiguity is

---

things, as being in the public interest, and in accordance with the public convenience and necessity:

"(a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

"(b) The regulation of air transportation in such manner as to recognize and preserve the inherent advantages of, assure the highest degree of safety in, and foster sound economic conditions in, such transportation, and to improve the relations between, and coordinate transportation by, air carriers;

"(c) The promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices;

"(d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

"(e) The promotion of safety in air commerce; and

"(f) The promotion, encouragement, and development of civil aeronautics."

critical to proper interpretation of § 414 of the Act,[14] which confers antitrust immunity upon "[a]ny person affected by any order made under [§ 408, *inter alia*] . . . insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order." What is "authorized, approved, or required" by the CAB must surely be determined, at least to a very large extent, by the scope of the Board's mandate to evaluate potentially anticompetitive conduct.

## II

The Court today neglects to resolve, or indeed even mention, this problem, and well it might, for the legislative history of the Act demonstrates that the competitive concerns that troubled the framers of the Aviation Act related exclusively to competition by and among air carriers. A major impetus to federal regulations of air transportation was the failure of the preceding era of freely competitive price and route warfare to bring stability to the Nation's air transport industry. In his statement accompanying the report of the Committee on Commerce on the Civil Aeronautics Act of 1938, Senator Copeland stated:

> "Competition among air carriers is being carried to an extreme, which tends to jeopardize the financial status of the air carriers and to jeopardize and render unsafe a transportation service appropriate to the needs of commerce and required in the public in-

---

[14] Section 414, 49 U. S. C. § 1384, reads:

"Any person affected by any order made under sections 1378, 1379, or 1382 of this title shall be, and is hereby, relieved from the operations of the 'antitrust laws,' as designated in section 12 of Title 15, and of all other restraints or prohibitions made by, or imposed under, authority of law, insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order."

terest, in the interests of the Postal Service, and of the national defense. Aviation in America today, under present laws, is unsatisfactory to investors, labor, and the air carriers themselves. . . . The committee feels that this bill will not only promote an orderly development of our Nation's civil aeronautics, but by its immediate enactment prevent the spread of bad practices and of destructive and wasteful tactics resulting from the intense competition now existing within the air-carrier industry." S. Rep. No. 1661, 75th Cong., 3d Sess., 2 (1938).

Similar views were voiced by the Chairman of the House Committee on Interstate and Foreign Commerce, Congressman Clarence Lea:

"Under existing law there is little economic regulation of air carriers. Routes are awarded not upon the basis of the ability of the particular air carrier to perform the service or the requirements of the public convenience and necessity, but upon the letting of air-mail contracts to the lowest responsible bidders. This system has completely broken down in recent months, because the air carriers, in their desire to secure the right to carry the mail over a new route, have made absurdly low bids, indeed, have virtually evinced a willingness to pay for the privilege of carrying the mail over a particular route. A route once secured, however, under the existing system of air-mail contracts does not protect the air carrier operating that route from possible cutthroat competition, for air carriers are not required to secure a certificate or other authorization from the Government before beginning operations, other than one based upon safety requirements. Nor, is there any authority in the Federal Government under existing law to prevent

competing carriers from engaging in rate wars which would be disastrous to all concerned.

"The result of this chaotic situation of the air carriers has been to shake the faith of the investing public in their financial stability and to prevent the flow of funds into the industry." H. R. Rep. No. 2254, 75th Cong., 3d Sess., 2 (1938).

A key aim of the new legislation, then, was to eliminate "cutthroat competition" among air carriers. From the beginning, the air carriers pushed for a scheme of regulation to control entry and regulate price competition in the air transportation market. Yet equally soon after serious consideration of an air regulation bill began, the prospect of regulation gave rise to concern that the new system of regulation might be used to foster the development of an "airline trust" or similar overconcentration in the air transportation market. In 1937, Commissioner Eastman of the Interstate Commerce Commission, who supported full federal regulation of air transportation, reminded the members of the Senate Commerce Committee that the proposed legislation would give the Commission unlimited authority to consolidate the Nation's airlines and, possibly, to do away with competition altogether. Eastman suggested that language be drafted to preclude undue consolidation among carriers.[15] As one commentator has stated, "Eastman's suggestion appears to have been heeded, for when the [1937] bill was reported, the merger clause contained [the language which became the antimonopoly restriction of section 408]." Comment, Merger and Monopoly in Domestic Aviation, 62 Col.

---

[15] Testimony of Joseph B. Eastman, Member, Interstate Commerce Commission, on S. 2 and S. 1760 before a Subcommittee of the Senate Committee on Interstate Commerce, 75th Cong., 1st Sess., 334–335 (1937).

L. Rev. 851, 856–857 (1962). Final consideration of the aviation bill was postponed until the next session of Congress, but when Senator McCarran and Representative Lea introduced legislation at the 1938 session to create an independent air regulatory agency, both bills "contained a monopoly proviso virtually identical to the one that had been added to the 1937 bills, as reported." *Id.*, at 857.

To implement § 408's scheme for balancing stability with competition in the air transportation market, the bill provided explicit antitrust immunity in § 414.[16] The debates over § 414—like the origins of § 408—reflect congressional concern with competition in the air transportation market. Senator McKellar asked Senator Truman, a major supporter of the aviation bill, if it were true that the proposed legislation would repeal the antitrust provisions of the existing airmail laws. When Senator Truman answered in the affirmative, Senator McKellar complained that:

> "[S]uch a provision is very inadvisable, and very bad legislation, and ought never to be agreed to.

---

[16] At the House hearings, Colonel Edgar Gorrell, President of the Air Transport Assn. of America, testified that a major element of uncertainty that kept money from flowing into commercial aviation was "cutthroat competition, . . . where one company went out to make warfare against another and wound up by destroying the capital of both. . . . That is a fact. It has happened, and the only agency or agent in America today that can stop it is myself; and the moment I stick my neck out to stop it, if I did, I would face a jail sentence and a fine for violating the antitrust laws. Our companies today cannot lawfully agree on prices." Hearings on H. R. 9738 before the House Committee on Interstate and Foreign Commerce, 75th Cong., 3d Sess., 309.

See *Silver* v. *New York Stock Exchange,* 373 U. S. 341, 347 (1963), where we noted that the relevant "collective action . . . would, had it occurred in a context free from other federal regulation, constitute a *per se* violation of § 1 of the Sherman Act."

As everyone knows, at the present time the air companies are complaining that they are not allowed to consolidate. Some years ago we allowed them to consolidate, and the result was the greatest ill that ever befell the air companies. The same ill will befall them again if such combinations are permitted.

.　　　.　　　.　　　.　　　.

"I desire to state that I cannot vote for any bill which proposes that a commission shall give air companies the right to combine and confederate into a huge monopoly. I regret very much that I shall have to vote against the bill." 83 Cong. Rec. 6728–6729.

Senator McCarran disagreed. He told Senator McKellar that the bill "contain[ed] every protection against the very thing which the Senator from Tennessee fears." Senator Truman reminded his colleagues of the § 408 proviso requiring that the Board approve no acquisition of control that would "result in creating a monopoly or monopolies and thereby unduly restrain competition or unreasonably jeopardize another air carrier not a party to the consolidation . . . ." Senator McCarran agreed that "every precaution has been written into the bill so that the antitrust laws and all laws for the prevention of combinations and monopolies shall be enforced. . . . Protection has been written into the bill against combinations and monopolies in restraint of trade, in restraint of commerce, and in restraint of everything which would constitute a monopoly." *Id.,* at 6729. Senator Copeland recited five different provisions of the bill "where the question of monopoly is dealt with in one way or another with the view to its control and prevention." When the debate turned from the discussion of general principles to ap-

plication of those principles to a particular fact situation, again the Senators spoke of consolidation and competition by air carriers.[17]

Thus, the debates, as well as the remainder of the legislative history of the 1938 Act, reflect that the Congress that enacted the 1938 legislation was concerned only with problems of competition and monopoly in the air carrier market. Moreover, the debates show that there was considerable concern over even the limited grant of antitrust immunity deemed necessary to provide the proposed authority with sufficient flexibility to administer the air carrier market in the public interest. It is most unlikely that the concerns expressed would have been put to rest by extending the new authority's pre-emptive antitrust responsibilities under § 408 beyond the air transportation market into every market that might happen to be touched by transactions with an air carrier.

## III

Our holding in *Pan American World Airways* v. *United States,* 371 U. S. 296, becomes important in this setting. There, the Government filed an antitrust complaint alleging, *inter alia,* anticompetitive interference by Pan American with the route acquisitions of Panagra, a joint venture of Pan American World Airways and W. R. Grace & Co. This court held that the complaint should be dismissed. The Court stood behind the presumption against implied antitrust immunity, 371 U. S., at 304–305, n. 9; however, for two interdependent reasons, the Court held that the conduct alleged in Panagra's complaint. was immunized from the antitrust laws. First, the conduct specified in the complaint fell within the

---

[17] 83 Cong. Rec. 6730–6731.

Board's basic mission and competency—the regulation of entry into and competition within the air transportation market:

> "Limitation of routes and divisions of territories and the relation of common carriers to air carriers are basic in this regulatory scheme." *Id.*, at 305.

Second, and equally important, we held that § 411 of the Act gave the Board a specific substantive mandate to investigate and regulate unfair practices and unfair methods of competition among air carriers in the air transportation market, *id.*, at 302, 308.

In *Pan American* the Board had not only the statutory power to supervise the relevant transactions but also the statutory responsibility to remedy the abusive features of those transactions specified in the Panagra complaint. Consequently, "If the courts were to intrude independently with their construction of the antitrust laws, two regimes might collide." *Id.*, at 310. Even this narrow holding provoked the dissent of MR. JUSTICE BRENNAN, in which Mr. Chief Justice Warren joined.

The present case is different from *Pan American* in a critical respect. Here, we may assume the Board possesses full authority under the Act to supervise § 408 transactions between a controlling person and an air carrier—just as in *Pan American,* the allocation of routes and division of territories constituted the basic stuff of the Board's day-to-day business. Yet, unlike the acts specified by Panagra in *Pan American,* the acts charged in TWA's complaint are components of an antitrust conspiracy to restrain trade in the aircraft supply and manufacturing market. Section 411 does not command Board responsibility for preventing such a conspiracy, since § 411 is in terms restricted to unfair methods of competition "in air transportation or the sale thereof." Thus, to sustain its result in this case, the Court must

fall back on one (or both) of two propositions: it must either find some specific authority in the Federal Aviation Act other than § 411 for its conclusion that the Board's mandate to police anticompetitive practices extends to the subject matter of TWA's complaint; or it must consider such statutory authority irrelevant to a finding of antitrust immunity. Neither approach is, in my view, sound.

## IV

A. Improbable as it seems, there is much in the Court's opinion to suggest that its judgment rests upon the assumption that antitrust immunity is conferred here simply by virtue of a rather extensive grant of procedural authority for the Board to intervene in the control-person-air-carrier relationship. The Court recounts in detail the history of the Board's involvement in the Toolco-TWA relationship—though the Court does not suggest, as it cannot, that the Board specifically considered the actions by Toolco alleged in TWA's complaint to violate the antitrust laws.[18] The Court tells

---

[18] Between 1956 and 1960, the Board entered various modification orders permitting Toolco and TWA to enter into short-term leases of jets and permitting various limited extensions of those leases. Specifically, the record shows that the Board approved 12 transactions between Toolco and TWA from 1956 to 1960:

—on May 17, 1956, the Board approved sale of 33 Lockheed aircraft, and spare parts, by Toolco to TWA;

—on Dec. 18, 1956, the Board approved a proposal for TWA to borrow some $10 million in operating capital from Toolco;

—on June 11, 1957, the Board approved a proposal whereby Toolco would refinance TWA's May 17, 1956, purchase of Lockheed aircraft;

—on Dec. 30, 1958, the Board again approved a transaction relating to the nonjet Lockheed aircraft;

—on Feb. 26, 1959, the Board approved a proposal whereby TWA would lease one Boeing 707-131 aircraft from Toolco, plus spare parts, for the purpose of training its crews to fly jet aircraft;

—on May 15, 1959, the Board approved the lease by Toolco to

us that in 1950, the Board embarked upon a wide-ranging evaluation of the treatment afforded TWA by Toolco as the controlling person—though the Court does not sug-

TWA of 11 Boeing 707–131 jet aircraft, with provision for obtaining spare parts from Toolco and leasing spare jet engines;

—on July 1, 1959, the Board approved the lease of four additional aircraft by Toolco to TWA, and the extension of the leases on the previous jet aircraft. The leases were prolonged pending the working out of "definitive financing arrangements" which, presumably, would enable TWA to acquire ownership of the aircraft;

—on Sept. 30, 1959, the Board again approved extension of the jet leases upon the representation of Toolco and TWA that financing arrangements had not yet been completed;

—on Jan. 29, 1960, the Board approved the lease by Toolco to TWA of eight 707–131's and eight Convair 880's (all jet aircraft), on a day-to-day basis, and again with provision for spare parts. This approval was again premised on completion in the near future of "definitive financing arrangements permitting [TWA] to operate these aircraft on a permanent basis";

—on June 23, 1960, the Board approved acquisition—*i. e.*, purchase—by TWA of 25 Boeing 707 and 20 Convair 880 jet aircraft, with $260 million to be raised by an offering of bonds and junior securities. Toolco was to guarantee the subscription and would lend $50 million to TWA to enable it to make the offering;

—on July 21, 1960, the Board approved acquisition of title to two additional jet aircraft by TWA from Toolco; and

—finally, on December 29, 1960, the Board approved creation of a voting trust for the placement of Toolco's holdings in TWA.

As the Court's opinion observes, damages were awarded for those allegations of the TWA complaint that charged that TWA had been damaged by the diversion of six Convairs by Toolco to Northeast Airlines; by the temporary retention by Toolco of four Convairs and the ultimate lease of these aircraft to Northeast; by the diversion of six Boeing jet aircraft, of 33 ordered, to Pan American Airways, TWA's principal trans-Atlantic competitor; by the lease of planes to TWA, in lieu of sales that would have been more to TWA's financial interest; and by the late delivery of 47 of the 63 jets procured for TWA by Toolco.

With the exception of the decision to lease planes to TWA rather than sell them, the actions alleged to have damaged TWA related, not to the documented structure of Toolco's transactions with TWA, as presented to and approved in fact by the Board, but rather to

gest, as again it cannot, that the 1950 proceeding of the Board even remotely considered Toolco's actions as components of an antitrust conspiracy directed toward the aircraft supply and manufacturing market.[19]  Finally,

_____

the manner in which Toolco executed the paper transactions, without Board approval or knowledge.  The leases were never considered in relation to other means of aircraft acquisition, as the complaint required they be viewed.  The Court dismisses these discrepancies by observing that the restraint alleged in *Pan American* was held to be immune "even though the CAB had taken no action to investigate, let alone act on, the alleged misfeasance as the Board has done here for over 16 years."  In other words, if the Board were responsible for complete supervision of the Toolco-TWA transactions, immunity would not be undermined by the Board's failure to undertake such supervision in fact.

At best, though, the Court's historical recitation is irrelevant since it in no way explains why it was the Board's statutory responsibility to consider the transactions between Toolco and TWA as components of an antitrust conspiracy allegedly pointed toward the aircraft supply and manufacturing market.

[19] The Board's 1950 proceeding undertook "to consider the over-all impact of the acquirer's plans and policies with respect to the controlled carrier."  12 C. A. B. 192, 196.  The Board reviewed the past transactions involving the financing of aircraft.  In particular, the Board considered whether Toolco had properly resolved, in favor of debt financing, a longstanding dispute between the Toolco and TWA managements over the relative merits of debt or equity financing of new aircraft.  The Board concluded that Toolco's financial and technical contributions to TWA had been of considerable benefit to the carrier.  On the other hand, the Board viewed TWA's capitalization as "neither reasonable nor sound" since "[i]ts proportion of debt to total capitalization is far too large."  *Id.*, at 218.  Yet "the extent to which Toolco and its principal officers can be held directly or principally responsible for TWA's present capital structure poses a most difficult problem," since "[n]umerous factors . . . operate to complicate and often delay agreement on a financial plan."  *Id.*, at 221.  On balance, the Board concluded that Toolco control of TWA had been in the public interest, and it approved the additional acquisition by Toolco of TWA stock.

While it is true that the Board's evaluation of Toolco's "stewardship" over TWA involved decisions regarding the acquisition of

the Court makes much of the powers of investigation and continuing supervision provided by § 415 of the Act—though the Court does not acknowledge that those powers are explicitly limited by Congress to Board actions "[f]or the purpose of exercising and performing [the Board's] powers and duties under this Act," and are therefore no indication of the scope of the Board's substantive responsibility.

The weakness inherent in the Court's recitation of "procedural underbrush" is that it leaps from the premise of the Board's acknowledged procedural power to intervene in § 408 "control" transactions to the conclusion that the Board's substantive statutory duty to consider the anticompetitive impact of such transactions is or, for some reason of policy, ought to be equally unlimited. Yet, inescapably, it is the Board's substantive mandate upon which antitrust immunity properly turns; as our prior decisions teach, the potential of colliding substantive judgments forces the carving out of antitrust immunity, not simply the overlapping of jurisdiction to intervene in a particular type of transaction. We have uniformly insisted upon a substantive mandate to the regulatory agency to consider fully and remedy the relevant anticompetitive conduct. See, in addition to *Pan American, supra, United States* v. *Borden Co.*, 308 U. S. 188, 206 (1939) (relevant provision of Capper-Volstead Act "does not cover the entire field of the Sherman Act"); *Georgia* v. *Pennsylvania R. Co.*, 324

---

aircraft, including the method of financing and the timing of purchase and lease decisions, there is nothing in the Board's decision to indicate that the Board's 1950 proceeding undertook to analyze Toolco's control of TWA from the perspective of Toolco's own market position. Consequently, the 1950 proceeding in no way suggests that the Board has deviated from its consistent position that Congress did not entrust it with the exclusive responsibility for policing anticompetitive effects of § 408 transactions.

U. S. 439, 458 (1945) ("no warrant in the Interstate Commerce Act and the Sherman Act for saying that the authority to fix joint through rates clothes with legality a conspiracy to discriminate against a State or a region, to use coercion in the fixing of rates, or to put in the hands of a combination of carriers a veto power over rates proposed by a single carrier"); *Milk Producers Assn.* v. *United States,* 362 U. S. 458, 469 (1960) (§ 7 of Clayton Act immunized "transactions duly consummated pursuant to authority given by . . . the Secretary of Agriculture" under statutory authority, but this included only marketing agreements and not agreements or restraints of wider scope typically covered by the antitrust laws); *California* v. *Federal Power Comm'n,* 369 U. S. 482, 485 (1962) ("Here . . . while 'antitrust considerations' are relevant to the issue of 'public interest, convenience, and necessity' . . . there is no 'pervasive regulatory scheme' . . . including the antitrust laws that has been entrusted to the Commission"); *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 351–352 (1963) (though Comptroller of Currency was required to consider effect on competition in passing on bank merger, not required to give the factor any particular weight, to hold a hearing, or to subject his determination to judicial review).

B. The major premise of the Court's decision must, then, be that the Federal Aviation Act imposes on the Board full responsibility for evaluating and preventing anticompetitive impact, of whatever variety, flowing from a control transaction touching an air carrier. As the Court puts it, "Competition and monopoly—two ingredients of the antitrust laws—are thus standards governing the CAB's exercise of authority in granting, allowing, or expanding or contracting the control which Toolco had over TWA by reason of the various orders issued by the CAB under § 408."

I cannot agree with the Court's reading of the provisions of the Act that require the Board to maintain competition. The Court offers no support for its reading of those provisions; and, as I have already indicated, the legislative history surely provides none. Moreover, the Board itself has consistently interpreted the Act not to impose on it the expansive role the Court now perceives for the first time. In a brief *amicus curiae* filed in 1964 and again in 1972, the Board disclaimed the mandate or the competency to police the aircraft supply market or any non-air carrier market which may be threatened by anticompetitive acts involving control of an air carrier. We have only recently reaffirmed the well-established doctrine that the consistent administrative construction of federal legislation "is entitled to great weight." *Trafficante* v. *Metropolitan Life Insurance Co., ante,* at 210; *Udall* v. *Tallman,* 380 U. S. 1, 16 (1965); *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 433–434 (1971). As for the Board's competence to do the job assigned it by the Court, we are not tied to the Board's self-appraisal, but "it is entitled to some weight," particularly when the legal issues surrounding Toolco's alleged behavior in the aircraft supply market "are typical antitrust problems and not at all typical airline law problems." "The search for a practical accommodation of court and agency . . . is not advanced by our ignoring the agency's considered sense of self-limitation." *Pan American World Airways, supra,* at 328, 330 (BRENNAN, J., dissenting).

If the Board's basic function, the Act's legislative history, and the Board's view of its own mandate and competence were not enough to convince me that the Court's reading of the Act is erroneous, these factors are at least enough to raise substantial doubts. Such doubts, as our prior cases teach, are enough to secure the continuing availability of anti-

trust or other judicial remedies as additional safe-
guards for protection of the public interest. "Repeals
of the antitrust laws by implication from a regulatory
statute are strongly disfavored." *United States* v. *Phila-
delphia National Bank, supra,* at 350, *United States*
v. *Borden Co.,* 308 U. S., at 198 ("a cardinal prin-
ciple of construction that repeals by implication are not
favored"). See *United States* v. *Socony-Vacuum Oil
Co.,* 310 U. S. 150, 226–228 (1940); *Georgia* v. *Pennsyl-
vania R. Co.,* 324 U. S., at 456–457; *California* v.
*Federal Power Comm'n,* 369 U. S., at 485, and 14 addi-
tional cases cited in MR. JUSTICE BRENNAN's opinion for
the Court in *United States* v. *Philadelphia National
Bank, supra,* at 350 n. 28. The traditional aversion to
implied repeal of the antitrust laws should have particu-
lar force in the context of the Federal Aviation Act, which
explicitly states that "[n]othing contained in this chapter
shall in any way abridge or alter the remedies now
existing at common law or by statute, but the pro-
visions of this chapter are in addition to such remedies."
49 U. S. C. § 1506; and see *Pan American World Airways,
supra,* at 321 (BRENNAN, J., dissenting).

Nor does the Court's result seem justifiable for prac-
tical reasons of regulatory accommodation. Indeed, I
find the Court's expansive reading of the Board's anti-
trust responsibilities inconsistent with our duty "to
make the [regulatory scheme] work." *Silver* v. *New
York Stock Exchange,* 373 U. S., at 357. Section 408 of
the Act has now been amended to require Board approval
when any person, whether or not engaged in any aspect of
aeronautics, acquires a controlling interest in an air car-
rier. In this age of conglomerate mergers, the time
may soon arrive when another industrial corporation
seeks to acquire control of an air carrier. It may well
be that some similar future acquisition may be in the
best interests of American air transportation. It may

likewise pose serious anticompetitive dangers. The Court's decision today will, I think, provide a serious obstacle to proper consideration of any such transaction that may be proposed in future years, since the Board will be faced with a difficult dilemma. If it approves the control acquisition, under the terms of the Court's decision the Board engages itself to exercise continuing supervision over all aspects of the control relationship, including the anticompetitive impact of the relationship in the computer market, the hotel market, the insurance market, the credit market, or whatever market happens to be affected by the control transaction. Quite understandably, the Board's response may be to play it safe, in keeping with its own advice to this Court that it cannot effectively function as the ombudsman of the American economy whenever that economy touches air transportation in any way. On the other hand, the Board may feel obliged to heed the Court's yawning interpretation of § 408. This course of action poses the threat that the Board will have extended itself so far beyond its competence and manpower that it is diverted from those central tasks of regulation imposed on it by § 408 of the Act. In either event, I cannot imagine that the Court's new reading of § 408 will contribute to the effective enforcement of the congressional scheme for promoting a sound national system of air transportation.

Returning to the 1964 efforts of Toolco to have the Court resolve the issue of the Board's authority with respect to the antitrust issue, it is elementary, of course, that a denial of a petition for certiorari decides nothing. It is also true that dismissal of a petition as improvidently granted, after full oral argument and briefing, is not a judgment on the merits in any sense. But when parties to litigation reach that stage and the Court fails to respond with a decision on the merits, lawyers read that as a signal that the case should proceed. These parties

did so—for nine years and more than 15 million dollars in legal expense—only to be told by the Court now that on the facts there is no legal liability—the very issue that could as well have been decided in 1964 as today. All of the litigation since 1964 has been confined to the massive task of determining damages and it will not do to say that the Court could not resolve the legal issues until damages were ascertained. Precisely the contrary is true.

For these reasons, I respectfully dissent from the Court's judgment. I would hold that actions permitted by the Board under § 408 of the Federal Aviation Act are "authorized, approved, or required" by the Board's action (and thereby immunized by § 414 from antitrust liability) only to the extent that the antitrust claim falls within the core of the Board's statutory responsibility to regulate air transportation while maintaining, in that market, the maximum degree of competition consistent with the public interest. In view of the Court's disposition, it would not be fruitful for me to express at length my views on the other issues presented to the Court, other than to note that, with modifications not relevant to the overriding issue, I would affirm the judgment of the Court of Appeals. At the very least, I would set the cases for reargument so the dispositive issue might be fully explored by the Court.