**LONG v. HAMMOND**

[164 N.C. App. 486 (2004)]

JAMES E. LONG, COMMISSIONER OF INSURANCE OF NORTH CAROLINA AND
LIQUIDATOR OF THE INTERNATIONAL WORKERS' GUILD HEALTH AND
WELFARE TRUST FUND, PLAINTIFF v. CLAIR HAMMOND, DEFENDANT

No. COA03-638

(Filed 1 June 2004)

**1. Insurance— health care—jurisdiction—multiple employer welfare arrangement—ERISA**

A de novo review revealed that the trial court did not err in a declaratory judgment action by granting summary judgment in favor of the Insurance Commissioner and by denying defendant insurance agent's motion to dismiss on jurisdictional grounds of federal preemption even though defendant contends the Commissioner's attempt to recover unsatisfied health care claims under the International Workers Guild (IWG) Fund is preempted by the federal Employee Retirement Income Security Act (ERISA) under 29 U.S.C. § 1144(a), because: (1) the IWG Fund is a Multiple Employer Welfare Arrangement (MEWA), without exception, and therefore it is subject to state regulation; (2) N.C.G.S. § 58-49-10 provides that a certificate, license, or other documents have to be provided to the Insurance Commissioner in order to show jurisdictional preemption, and the parties stipulated that no such preemption documentation has been provided thus making the IWG Fund subject to all appropriate provisions of Chapter 58 regarding the conduct of its business; and (3) contrary to defendant's assertion that N.C.G.S. § 58-49-10 is in conflict with the preemptive declaration of ERISA in 29 U.S.C. § 1144(a), the statutes mesh consistently when 29 U.S.C. § 114(b)(6)(A)(ii) expressly grants MEWA regulation to the states as MEWA is defined in ERISA.

**2. Insurance— health care—agents directly or indirectly writing contracts—unauthorized business—strict civil liability**

A de novo review revealed that the trial court did not err in a declaratory judgment action when it ruled that defendant insurance agent who wrote unlicensed contracts of insurance to citizens of North Carolina was subject to strict civil liability for unpaid claims in the amount of $9,464.76 even though defendant contends he was acting under a genuine belief that he was marketing an ERISA certified health coverage plan which was not subject to any state licensing requirement, because: (1) the plain

language of N.C.G.S. § 58-33-95 has no intent requirement; (2) the insurance agent is in a better position than the insured to determine if the insurance company was lawfully doing business in the state; and (3) the framework and language of N.C.G.S. § 58-33-95, together with the public policy concerns of protecting the rights and claims of insureds, show that the statute imposes a standard of strict liability on agents who directly or indirectly write contracts of insurance where a company is not authorized to do business in the State of North Carolina.

Appeal by defendant from summary judgment entered 6 March 2003 by Special Superior Court Judge for Complex Business Cases Ben F. Tennille, in Wake County Superior Court. Heard in the Court of Appeals 4 February 2004.

*Attorney General Roy Cooper, by Assistant Attorney General E. Clementine Peterson, for the State.*

*Daniel R. Flebotte for defendant appellant.*

McCULLOUGH, Judge.

This case is one of twenty-seven similar cases designated as exceptional pursuant to Rule 2.1 of the General Rules of Practice for the Superior and District Courts. The following are the stipulated facts of this case: In or about 1995, certain persons in New York formed legal entities for the purpose of providing health care benefits to employees who participated in an arrangement they created which purported to be a multiple insurance plan. The arrangement was between an organization they created called the National Association of Business Owners and Professionals (NABOP) and a pre-existing labor union, the International Workers Guild (IWG). The Fidelity Group (Fidelity) was the third-party administrator of the plan for claims made under the arrangement. The arrangement was such that people seeking health care benefits would be allowed to join the IWG and would be provided health benefits through the administration of a third-party trust called International Workers' Guild Health and Welfare Trust Fund (IWG Fund). The IWG Fund was administered by Fidelity. The arrangement provided in part that employers would join in a purported collective bargaining agreement prepared by the organizers of the arrangement with IWG and NABOP. The essence of the plan was that the employers would join NABOP and the employees would join IWG. All parties would agree to bind themselves to the

purported collective bargaining agreement that was already negotiated by the organizers of the arrangement.

Certain filings were made with the United States Department of Labor to qualify and register the IWG Fund to be a federal Employee Retirement Income Security Act (ERISA) plan, 29 U.S.C. §§ 1001-1461. Prospective members were informed that the employee benefit welfare plan arrangement was designed to provide health benefits pursuant to ERISA.

Prior to marketing the employee benefit welfare plan arrangement in North Carolina, the organizers/officers of this arrangement registered the corporate entity of the International Workers Guild, Inc., with the Secretary of State of North Carolina. However, they did not seek or obtain approval to be a licensed insurer in the state pursuant to applicable North Carolina law.

Organizers/officers of this arrangement approached North Carolina insurance agents, such as defendant Mr. Clair Hammond (Mr. Hammond), to market the plan. Mr. Hammond, licensed to sell health insurance in North Carolina, attended several marketing meetings in which the arrangement was presented to him as an opportunity to provide health care benefits to citizens of North Carolina. Mr. Hammond, representing the IWG Fund, received compensation for marketing the arrangement to various employers and employees of North Carolina.

During 1997 and thereafter, claims for health care services were made by various employees of companies that participated in this arrangement throughout the United States, including many by North Carolina citizens, and many of such claims went unpaid.

On 15 December 1998, a civil action was filed by the Secretary of Labor (SOL) for the United States Department of Labor (DOL) in the U.S. District Court for the Eastern District of New York against NABOP, IWG, and the IWG Fund. The SOL charged those defendants with breaches of their fiduciary duties in administration of the IWG Fund under various ERISA provisions and sought to enjoin acts and practices alleged to be in violation of provisions of ERISA. Within the federal matter, David W. Silverman (Silverman) was appointed by court order dated 24 December 1998 to be an independent fiduciary of the IWG Fund and receiver for the original fund trustee, Fidelity.

On 7 January 2000, a supplemental complaint was filed within the federal action by Silverman to recover IWG Fund assets. Silverman

pleaded that the IWG Fund was funded by contributions from employers participating in the IWG Fund; that there were invoices characterizing a portion of the payment to the IWG Fund as "union fees" and "association fees" and that the purpose of the payment was to obtain health benefits on behalf of participants of the IWG Fund; and that contributions remitted by the employers for the purpose of obtaining benefits through the Fund, including amounts reported to be union fees or association fees, were "plan assets" within the meaning of ERISA. In the supplemental pleadings, Silverman further alleged that the insurance agents and various other persons who had marketed the arrangement, including defendant, were recipients of trust assets, and provided administrative and financial services to the IWG Fund by procuring third-party employers to purchase health services for themselves and their employees and thus were "a party in interest" under ERISA. See 29 U.S.C. § 1002(14)(B). By marketing the arrangement, these defendants became agents of NABOP and IWG and their acts were that of fiduciaries. Because these defendants received trust assets from the IWG Fund, in the form of commissions on their sales, Silverman contended that these defendants engaged in prohibited transactions in violation of ERISA and he thus sought monetary damages or a constructive trust over the assets of the agents or for other equitable relief.

Several of the North Carolina defendants to Silverman's supplemental complaint settled their claims relating to trust assets received as commissions, and a voluntary dismissal was taken against them. A default judgment was entered against Mr. Hammond.

Upon learning that there were unpaid medical claims, the North Carolina Commissioner of Insurance (Commissioner) initiated an investigation. At an administrative hearing, the Commissioner determined that the arrangement that had been sold in North Carolina was a Multiple Employer Welfare Arrangement (MEWA) and therefore subject to the North Carolina Department of Insurance. Pursuant to this determination, the State of North Carolina initiated suit in Wake County Superior Court to seek an order of liquidation against the IWG Fund. On 29 March 1999 the Court ordered the liquidation and appointed James E. Long, Commissioner of Insurance, to be liquidator. Under the order, the Commissioner was empowered and directed to exercise, enforce, and prosecute all rights, remedies, and powers of any creditor, shareholder, policyholder, or member of the IWG Fund.

Beginning in the year 2000, the Attorney General of the State of North Carolina, as counsel for the Commissioner, brought various actions against agents to collect money to pay unpaid medical claims due under IWG Fund insurance contracts. In a complaint filed 22 July 2000 against defendant, the Commissioner alleged defendant marketed and sold contracts of medical insurance for a company not licensed by North Carolina and in direct violation of State law. Specifically, the Commissioner alleged that these medical benefits provided for by the Fund were not fully insured by a State authorized insurer and the Fund operated in North Carolina as a MEWA as defined by North Carolina law and ERISA. The Commissioner further contended that the Fund was not exempt from State regulations under the ERISA provisions. Pursuant to these claims, the Commissioner sought payment of claims in the amount due under the IWG Fund contracts made through Mr. Hammond.

On 15 February 2002, the named parties to this case submitted to the superior court a joint motion for declaratory ruling with regard to two issues: the first issue was for the court to determine whether the IWG Fund was required to be licensed under the insurance laws of North Carolina; the second issue was whether the insurance agents in North Carolina who sold the IWG Fund are "strictly liable" under N.C. Gen. Stat. § 58-33-95 (2003) for unpaid claims. On 22 July 2002, the court entered its Order and Opinion. The court found that the IWG Fund did require licensing by the State, and that agents who write contracts for unlicensed insurers are strictly liable under N.C. Gen. Stat. § 58-33-95.

Pursuant to this judgment, the Commissioner filed a motion for summary judgment on 7 November 2002. On 6 March 2003, Judge Tennille, who issued the 2002 declaratory order, granted summary judgment in favor of the Commissioner in the amount of $9,464.76 which represented certain claims owed by the IWG Fund to claimants solicited to the Fund by Mr. Hammond.

In this appeal, defendant Hammond has assigned multiple errors to both Judge Tennille's declaratory order, and his order granting summary judgment. These errors are framed in two issues as set out here and addressed below: (I) the trial court committed reversible error when it denied Mr. Hammond's motion to dismiss on jurisdictional grounds of federal preemption; (II) the trial court committed reversible error when it ruled N.C. Gen. Stat. § 58-33-95 imposes a standard of strict liability on agents who directly or indirectly write

contracts of insurance where a company is not authorized to do business in the State of North Carolina. As to both of these issues reviewed *de novo*, we affirm the trial court's declaratory order and grant of summary judgment in favor of the Commissioner.

## Federal Preemption

**[1]** In his first assignment of error, Mr. Hammond contends that the arrangement at issue in this case falls under exclusive federal jurisdiction. Specifically, defendant argues that the Commissioner's attempt to recover unsatisfied claims under the IWG Fund is preempted by ERISA, which states in relevant part: "Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 4(a) [29 USC § 1003(a)] and not exempt under section 1003(b) of this title." 29 U.S.C. § 1144(a) (1999). Subparagraph (b) saves certain state laws, as well as federal laws, from ERISA preemption, including an exception for state regulation of MEWAs. 29 U.S.C. § 1144(b) (2003). Furthermore, the portion of this section of ERISA pertaining to MEWAs and known as the "MEWA Clause," provides that where the subject of regulation is an ERISA-covered MEWA that is not fully insured:

> (ii) ... *any law of any State which regulates insurance may apply to the extent not inconsistent with the preceding sections of this subchapter.*

29 U.S.C. § 1144(b)(6)(A)(ii) (emphasis added). Mr. Hammond seems to stipulate that the IWG Fund in this case otherwise falls under the MEWA exception of this section and thus would be exposed to State regulation as a not fully insured, self-insured MEWA. But, he further contends that, because the IWG Fund was established or maintained pursuant to a collective bargaining agreement, it falls out of the definition of MEWA as set out in 29 U.S.C. § 1002(40)(A) (2003). Therefore, Mr. Hammond maintains that 29 U.S.C. § 1144(a) at all times governs the IWG Fund, preempting any State regulation. In the alternative, Mr. Hammond argues that if the IWG Fund is a MEWA subject to state law, then the state law is still preempted as being inconsistent with ERISA. We disagree on all fronts.

### I. MEWA—Multiple Employer Welfare Arrangement

#### A. Is this Arrangement Otherwise a MEWA?

A MEWA is defined in ERISA as:

(40)(A) The term "multiple employer welfare arrangement" means an employee welfare benefit plan, or any other arrangement (other than an employee welfare benefit plan), which is established or maintained for the purpose of offering or providing any benefit described in paragraph (1) to the employees of two or more employers (including one or more self-employed individuals), or to their beneficiaries, except that such term does not include any such plan or other arrangement which is established or maintained—

(i) under or pursuant to one or more agreements which the Secretary finds to be collective bargaining agreements,

(ii) by a rural electric cooperative, or

(iii) by a rural telephone cooperative association.

29 U.S.C. § 1002(40)(A).

As stipulated to in this case, employers would join the purported collective bargaining agreement between NABOP and IWG. By joining, this allowed employers to confer health care benefits to their employees as insured by the self-insured IWG Fund, a benefit described in 29 U.S.C. § 1002(1). The IWG Fund was administered by the third-party trustee, Fidelity. The health care plan was offered to employees of two or more employers domiciled in North Carolina. Therefore, we hold that under the ERISA definition, the arrangement at issue in this case was a MEWA.

We find support in our holding in Mr. Silverman's supplemental complaint to that of the SOL, in which it was alleged the arrangement was a MEWA. A default judgment was later entered against Mr. Hammond as to this complaint. The effect of a default judgment deems Mr. Hammond as having admitted the arrangement was a MEWA. See Trans World Airlines, Inc. v. Hughes, 449 F.2d 51, 69-70 (2d Cir. 1971), rev'd on other grounds, 409 U.S. 363, 34 L. Ed. 2d 577 (1971). We therefore deem those pleadings as admitted in this Court. First-Citizens Bank & Trust Co. v. Four Oaks Bank & Trust Co., 156 N.C. App. 378, 380, 576 S.E.2d 722, 724 (2003) (granting full faith and credit to a federal judgment). Additionally, at oral argument Mr. Hammond did not contest that the subject arrangement was otherwise a MEWA, but contended that it fell out of the definition of a

MEWA as it fit within the collective bargaining exception to the MEWA definition.

*B. Does the IWG Fund Meet the Collective Bargaining Exception to the definition of a MEWA?*

A plan that otherwise fits the definition of a MEWA, can fall out of that definition if it is "under or pursuant to one or more agreements *which the Secretary finds* to be collective bargaining agreements[.]" 29 U.S.C. § 1002(40)(A)(i) (emphasis added). There is no such finding by the SOL in the record, and both parties stipulate to such:

> 35. As of today's date neither the United States Department of Labor and any subsection thereof nor any specific secretary or assistant secretary or other authorized official has made any official determination as to whether the IWG Fund was properly established an ERISA Plan entitling it to preemption from state regulation, or that the IWG Fund was a Multiple Employer Welfare Arrangement (MEWA).

We accordingly find this arrangement a MEWA without exception.

Defendant cites *Virginia Beach Policemen's Benev. Ass'n v. Reich*, 881 F. Supp. 1059 (E.D. Va. 1995), *aff'd without opinion*, 96 F.3d 1440 (4th Cir. Va. 1996), for the proposition that a federal court is best suited to determine if a MEWA falls within a collective bargaining agreement when the SOL has made no such findings. We agree *Virginia Beach* offers guidance, but does so on the fact that a state is presumptively free to regulate a MEWA when the SOL has not made findings as to its collective bargaining status. The court in *Virginia Beach* found,

> [i]t is clear that, through ERISA section 3(40)(A)(i), Congress intended to promote state regulation of MEWAs. The Court finds that, consistent with the legislative history, *only if the Secretary chooses to make a finding*, would a MEWA receive exemption from state regulation.

*Id.* at 1070 (emphasis added). The rationale for this conclusion was based on interpretation of ERISA section 3(40)(A)(i), particularly with respect to the legislative history. *Id.* at 1067-71. The 10th Circuit has held similarly: "Congress obviously viewed self funded arrangements by multiple employers to be different, and less deserving of federal preemption from state insurance regulators[.]" *Fuller v. Norton*, 86 F.3d 1016, 1024 (10th Cir. 1996). The court in *Virginia*

*Beach* went on to hold that the SOL's decision whether to make a finding under ERISA section 3(40)(A)(i) is committed to agency discretion and therefore unreviewable. *Virginia Beach Policemen's Benev. Ass'n*, 881 F. Supp. at 1071.

The statutory language as to the collective bargaining agreement exception to the MEWA definition is clear. It refers only to those agreements that the SOL finds to be collective bargaining agreements, and therefore we need not make our own determination as to whether the subject arrangement was made pursuant to a collective bargaining agreement under North Carolina law. We conclude that, because the IWG Fund otherwise meets the definition of a MEWA, a determination the Commissioner of Insurance can make on its own, North Carolina can regulate the MEWA until the SOL makes some finding to the contrary.

Because we hold that the IWG Fund is a MEWA, without exception, and therefore subject to state regulation, we next consider the applicability of North Carolina insurance law to this MEWA.

*II: Applicable State Law*

*A. Required Showing of Preemption in N.C.*

To show jurisdictional preemption, North Carolina insurance law requires the following:

> A person may show that it is subject to the exclusive jurisdiction of another agency or subdivision of this State or the federal government, by providing to the Commissioner the appropriate certificate, license, or other document issued by the other governmental agency that permits or qualifies it to provide those services. If no documentation is issued by that other agency, the person may provide a certification by an official of that agency that states that the person is under the exclusive jurisdiction of that agency.

N.C. Gen. Stat. § 58-49-10 (2003). The record shows no "certificate, license, or other documents" have been provided to the Commissioner. The parties themselves have stipulated no such preemption documentation has been provided. Therefore, the IWG Fund was subject to all appropriate provisions of Chapter 58 regarding the conduct of its business. *See* N.C. Gen. Stat. § 58-49-20 (2003).

Mr. Hammond argues that the presumed jurisdiction of N.C. Gen. Stat. § 58-49-10, without a showing otherwise, is in conflict

with the preemptive declaration of ERISA in 29 U.S.C. § 1144(a). We disagree.

Generally, the U.S. Supreme Court has held that there is a presumption against federal preemption, absent some showing to the contrary. *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 741, 85 L. Ed. 2d 728, 741 (1985). This is especially true when determining applicable regulation of a MEWA. 29 U.S.C. § 1144(b)(6)(A)(ii), expressly grants MEWA regulation to the states as MEWA is defined by ERISA. For an insurance plan that otherwise meets the definition of a MEWA to then have that MEWA status removed as one made pursuant to a collective bargaining agreement, it must provide an affirmative finding by the SOL. 29 U.S.C. § 1002(40). This finding by the SOL is tantamount to that required under N.C. Gen. Stat. § 58-49-10, and would surely suffice as such. Therefore, rather than contradictory, N.C. Gen. Stat. § 58-49-10 and ERISA at 29 U.S.C. 1144(b)(6)(A)(ii), as a MEWA is defined by ERISA section 3(40)(A), mesh consistently.

### B. State MEWA Requirements

North Carolina insurance law provides that the term MEWA means that term as defined by ERISA at 29 U.S.C. § 1002(40)(A). N.C. Gen. Stat. § 58-49-30 (2003). North Carolina law requires MEWAs be licensed:

> (a) It is unlawful to operate, maintain, or establish a MEWA unless the MEWA has a valid license issued by the Commissioner. Any MEWA operating in this State without a valid license is an unauthorized insurer.

N.C. Gen. Stat. § 58-49-35 (2003). There is no dispute over the fact that Mr. Hammond did not comply with this statute when selling the IWG Fund, a MEWA. In light of the analysis above, Mr. Hammond was therefore properly subject to the penalty of N.C. Gen. Stat. § 58-33-95 for selling the unlicensed MEWA.

### Strict Liability of N.C. Gen. Stat. § 58-33-95

[2] The other issue raised by Mr. Hammond in this appeal is whether he can be held strictly liable for the penalty set forth by N.C. Gen. Stat. § 58-33-95. Specifically he argues that, because he acted under a genuine belief that he was marketing an ERISA certified health coverage plan which was not subject to any state licensing requirement, he cannot be liable for the unpaid claims of $9,464.76. We disagree.

Mr. Hammond stipulates that the IWG Fund was a provider of health care benefits to residents of North Carolina; that the IWG Fund was not licensed by the North Carolina Department of Insurance; and that defendant, as a representative of the IWG Fund, sold the health care benefits to various employers and employees in North Carolina. Furthermore, as we have held above, the IWG Fund was a MEWA subject to state regulation. Mr. Hammond marketed this unlicensed IWG Fund to citizens of North Carolina for a commission, and these citizen's claims under the Fund went unpaid.

Mr. Hammond makes the argument that there should be a presumption against construing a statute as imposing strict liability upon an offender. He cites *Morissette v. United States*, 342 U.S. 246, 96 L. Ed. 288 (1952), relating to criminal intent. He further cites a number of North Carolina cases dealing with the requirement of criminal intent as related to criminal offenses. However, because there has been no criminal charges brought against Mr. Hammond under N.C. Gen. Stat. § 58-33-95, we need not consider the strict liability aspect of the statute in regard to the Class 1 misdemeanor it may impose. As to whether the statute is one of strict civil liability, we hold it to be so.

While there is no North Carolina case law specifically holding that N.C. Gen. Stat. § 58-33-95 imposes a standard of strict liability, we find the statute's surrounding framework, its plain language, and public policy concerns sufficient for our interpretation that it does.

Article 30 of Chapter 58 of the North Carolina General Statutes governs insurer supervision, rehabilitation, and liquidation. The construction and purpose of Article 30 is stated as follows:

(b) This Article shall be *liberally* construed to effect the purpose stated in subsection (c) of this section.

(c) The purpose of this Article is to protect the interests of policyholders, claimants, creditors, and the public generally with minimum interference with the normal prerogatives of the owners and managers of insurers, through;

* * * *

(3) Enhanced efficiency and economy of liquidation, through clarification of the law, to minimize legal uncertainty and litigation;

N.C. Gen. Stat. § 58-30-1 (2003) (emphasis added). It is under this liberal construction that a liquidator has the power "[t]o exercise and

enforce all rights, remedies, and powers of any creditor, shareholder, [or] policyholder[.]" N.C. Gen. Stat. § 58-30-120(19) (2003) (enumerating the powers of a liquidator).

Pursuant to the liberal powers of the liquidator under Article 30, the Commissioner brought an action under N.C. Gen. Stat. § 58-33-95 against Mr. Hammond, the undisputed agent of the insurer. That statute provides:

> Any person representing an insurer is *personally liable* on all contracts of insurance unlawfully made by or through him, directly or indirectly, for any company not authorized to do business in the State. . . . If any person shall unlawfully solicit, negotiate for, collect or transmit a premium for a contract of insurance or act in any way in the negotiation or transaction of any unlawful insurance with an insurance company not licensed to do an insurance business in North Carolina, he shall be guilty of a Class 1 misdemeanor.

*Id.* (emphasis added). The statute warrants both civil and criminal liability without mention of any intent. Summary judgment was granted in favor of the State finding Mr. Hammond personally and strictly liable under this statute. The State brought no criminal charges.

The plain language of N.C. Gen. Stat. § 58-33-95 has no intent requirement, and we will not attempt to engraft it where the language is clear and unambiguous. *Begley v. Employment Security Comm.*, 50 N.C. App. 432, 436, 274 S.E.2d 370, 373 (1981). We find our unambiguous reading of the statute supported by the fact that Article 33 contains another section which was last amended in 1994 along with N.C. Gen. Stat. § 58-33-95, and that this section does possess an element of intent. *See* N.C. Gen. Stat. § 58-33-105 (2003) (dealing with false statements made in applications for insurance, requiring "knowing[] or willful[]" acts). We credit the legislature with deliberate composition of its statutes unless there is some construction and policy concern sufficient to raise an ambiguity. There is no such ambiguity in the statute at issue.

Our interpretation of N.C. Gen. Stat. § 58-33-95 is supported by the public policy underpinnings of comporting with the state's overall interest in protecting its insured citizens. Judge Tennille stated this policy consideration succinctly in finding no. 31 of his order, where he stated:

[T]he agent was in a better position than the insured to determine if the company was lawfully doing business in the state. Consumers, particularly in plans such as that offered by IWG, have little knowledge of the licensing requirements and virtually no way to protect themselves. Agents, on the other hand, are more sophisticated and should know if the company they represent is licensed. If it is not, they know they are taking some risk in selling the product and have some obligation to determine if the company should be licensed. Where, as here, the agents themselves have been misled by the company, the State has elected to place the burden of the failure to pay the claims on the agents who sold the product and received commissions rather than the consumers who have paid premiums and relied on the existence of coverage. That allocation is fair.

We believe this same policy consideration is reflected in the construction of Article 30 and the liquidator's power to pursue the rights and actions of policyholders under laws that are clear and efficient. The liquidator is often acting on behalf of the state's insured, protecting their rights and claims. We conclude these policy considerations support our strict construction of N.C. Gen. Stat. § 58-33-95.

For the foregoing reasons, we uphold Judge Tennille's declaratory order and opinion and his grant of summary judgment in favor of the State, pursuant to that order and opinion. We conclude that the IWG Fund was required to be licensed under the provisions of Article 49 of Chapter 58 of the North Carolina General Statutes and that N.C. Gen. Stat. § 58-33-95 imposes a standard of strict liability on agents, such as Mr. Hammond who wrote the IWG Fund contracts of insurance. Mr. Hammond is therefore liable in the amount of $9,464.76 for unpaid claims under the IWG Fund.

Affirmed.

Judges HUNTER and LEVINSON concur.